UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **SPORTS ENTERPRISES, INC.**, an Oregon corporation,<br><br>                Plaintiff,<br><br>      v.<br><br>**RSUI INDEMNITY COMPANY**, a New Hampshire corporation,<br><br>              Defendant. | Case No. |

**COMPLAINT AND JURY DEMAND**

The plaintiff Sports Enterprises, Inc. d/b/a the Salem-Keizer Volcanoes ("SEI"), as judgment creditor to the National Association of Professional Baseball Leagues, Inc. ("National Association") and assignee of Tom Volpe ("Volpe" and together with National Association, collectively, the "Insureds") brings this action against the defendant RSUI Indemnity Company ("RSUI") and alleges as follows:

**NATURE OF THE CASE**

1. This is an action for breach of an insurance contract that arises out of the wrongful declination of coverage by RSUI with respect to an adversary proceeding brought by SEI against the Insureds, and other defendants in Marion County Circuit Court in Oregon, Case No. 21CV06637 (the "Underlying Action").

2. RSUI agreed to insure the National Association of Professional Baseball Leagues, Inc. ("National Association") and its officers and directors, under a Directors and Officers Liability insurance policy effective from March 12, 2020 through March 12, 2021 (the "D&O Policy"). SEI initiated the Underlying Action, alleging injury based on conduct covered under

Page 1 - COMPLAINT

the D&O Policy.  The Insureds notified RSUI of the claims.  However, RSUI rejected Insureds' tender of defense.

3. The Insureds were both harmed by RSUI's failure to defend them, with Volpe incurring substantial legal fees and the National Association suffering a judgement against it for $5,550,000.  Ultimately, SEI settled its claims against Volpe based on allegations that Volpe breached his fiduciary duties as a member of the board of directors of the National Association, a Florida non-profit entity, and agent for the president of the National Association.  As part of the settlement, Volpe assigned his claims against RSUI for defense costs and indemnity to SEI.  SEI also obtained a judgment against the National Association in the amount of $5,550,000 based on SEI's claims that the National Association breached its fiduciary duties to SEI as a member (owner) of the National Association.  Prior to entry of the judgment, the National Association dissolved, and the judgment remains unsatisfied.  Accordingly, SEI, as a judgment creditor of the National Association and as assignee of Volpe's rights as an Insured Person under the D&O Policy, seeks damages against RSUI for breach of its obligations under the D&O Policy.

## PARTIES

4. SEI is an Oregon corporation with its principal place of business in Marion County, Oregon.  SEI owns and operates the Salem-Keizer Volcanoes, formerly a minor league baseball team (the "Volcanoes").

5. Defendant RSUI Indemnity Company, is a New Hampshire insurance company with its principal place of business located at 945 East Paces Ferry Road, Suite 1800, Atlanta, Georgia 30326.  Defendant holds a certificate of authority to transact insurance in the state of Oregon from the Oregon Department of Consumer and Business Services.

## JURISDICTION AND VENUE

6. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the dispute is between citizens of different states.

7. This court has general jurisdiction over defendant because it is incorporated in New Hampshire and its principal place of business is in Georgia.

8. Venue is proper under 28 U.S.C. § 1391(b)(1) because defendant is an entity incorporated under the laws of the state of New Hampshire and is therefore subject to this court's jurisdiction.

## BACKGROUND

9. On September 6, 1901, various minor baseball leagues and clubs formed the National Association to advocate collectively for the rights and benefits of minor league baseball leagues and minor league clubs nationwide, hereafter collectively referred to as "Minor League Baseball" or "MiLB."

10. Since at least 1903, the National Association, on behalf of its MiLB club members, negotiated various agreements with various entities doing business as Major League Baseball over the years ("MLB"). Specifically, the National Association negotiated and entered into various professional baseball agreements ("PBA") with MLB. Since 1903 (until winter 2020), there had been, in some form, a PBA in place between the National Association and MLB. Each PBA included a term (usually five or ten years) to provide an opportunity for the parties to update the terms and renegotiate based on market and other changes. But the PBA always got renewed.

11. Unlike other professional sports associations, for example the National Basketball Association, which has a "G League" that is owned by the NBA, MLB did not have its own "farm" system. Instead, MLB relied entirely on its relationship with the National Association and the MiLB clubs to provide the infrastructure and operations necessary for the placement and

development of players not yet ready for MLB (or players performing injury rehabilitation). MLB could not operate its minor league farm system without its relationship with the National Association and the MiLB clubs.

12. The PBA governed the relationship between the National Association and MLB and effectively controlled the relationship between MiLB clubs and their MLB club affiliates. Each MiLB club executed a one-page uniform Player Development Contract ("PDC") as the "one and only" form of working agreement or contract permitted between a major league club and a minor league club, which essentially just incorporated the terms of the most recent version of the PBA negotiated by the National Association.

13. Thus, for over 100 years, the National Association represented the financial interests of each of its member clubs, primarily by representing each member club with respect to their business relationship with an MLB affiliate club.

14. In or around 1976, the National Association incorporated as a Florida not-for-profit corporation under Fla. Stat. § 617 *et seq*.

15. The National Association adopted a set of articles and bylaws pursuant to Fla. Stat. § 617.0202 and Fla. Stat. § 617.0206 known as the National Association Agreement (as amended, the "NAA") to govern the organization.

16. State law, the NAA, and over 100 years of organizational practice provided the framework for governance of the National Association, which included the following:

   a. Establishing a Board of Trustees ("BOT"), the equivalent to a Board of Directors based on the definition in Fla. Stat. § 617.01401(2), with all corporate powers of the National Association, except for those expressly retained by the members, are vested in the BOT. At all material times, Tom Volpe was a member of the BOT.

Page 4 - COMPLAINT

  b. Establishing a procedure for electing a President to oversee the business activities of the National Association and report to the BOT and, most importantly, to exercise "exclusive power" over relations with MLB. At all material times, Patrick O'Conner was the President of the National Association.

17. By participating in minor league baseball, each of the MiLB clubs gave up rights to individually negotiate with MLB, thereby placing the biggest contributing factor to the financial success or failure of each club into the hands of the BOT and the President.

18. In 1990, the National Association and MLB agreed to certain modifications to the prior PBA. Specifically, the 1990 Professional Baseball Agreement ("1990 PBA") contained one significant change from previous editions: MLB agreed to at all times have its major league clubs maintain an affiliation with a minimum number of minor league clubs (at the time, 119 total minor league affiliations). In essence, the 1990 PBA served as a grant of exclusive right to an affiliation for all National Association members.

19. The guaranteed affiliation, in turn, resulted in each MiLB club receiving players under contract with MLB clubs at little or no cost to the MiLB club. In other words, by being a MiLB club with an MLB affiliation, MLB paid all the players, even those in the farm system. As a result, the MiLB clubs did not incur the substantial (and often prohibitive) expense of paying their players.

20. The limited number of guaranteed affiliations also ensured a stable market for these clubs to be bought and sold, thereby maintaining the market value of the clubs. Other privileges included territorial protection from infringement by other MiLB clubs and royalties from certain intellectual property. The NAA also provided for financial compensation to be paid to impacted MiLB clubs in the event any new non-affiliated club joined the National Association (essentially a buy-in fee to be paid by the joining club).

21. In 1994, SEI entered into a four-year term PDC (to begin during the 1995 season) with the MLB club known as the San Francisco Giants (the "Giants") for SEI (first as the Bellingham Giants and later as the Volcanoes) to be the Giants' short season single-A team affiliate playing in the Northwest League. The PDC incorporated all the terms and conditions as set forth by MLB and MiLB in the PBA. For the next 26 years, through the end of 2020, SEI continuously maintained a contractual relationship with the Giants (through two-year extensions of that PDC).

22. The most recent iteration of the PBA occurred in 2004 (the "2004 PBA"), which was effective from October 1, 2004, through September 30, 2020. The 2004 PBA also expanded the membership of the National Association and the number of exclusive affiliations that would be maintained with MLB clubs from 119 to 160.

23. In early 2019, MLB began discussions with the National Association regarding negotiation of a new PBA after the expiration of the 2004 PBA. The National Association had considerable bargaining power when negotiating with MLB. The National Association represented all 160 minor league clubs, each with stadiums (either leased or owned), fan bases, infrastructure (parking, concessions, etc.), contracts with vendors and advertising, and various licenses and trademarks. Not to mention substantial other key benefits such as, in the case of the Volcanoes, a network of local host families that housed the MLB players. MLB had over 4,000 minor league players that needed a place to live, practice, and play. Without access to the MiLB system, it would not have been feasible for MLB to simply find an alternative, thereby substantially impairing each of the billion-dollar MLB franchises. Not only that, but MLB was also acutely aware of the public and political backlash it would face from pulling its product out of so many small (often rural) communities.

24. As part of those initial discussions, MLB proposed the idea of contracting some minor league clubs as part of the new PBA because MLB wanted to reduce the number of minor league players that each team had on its payroll. MLB also wanted to have more control over accommodations and other aspects related to the player-experience.

25. On information and belief, MLB's initial proposal also included the concept of certain MiLB clubs or independent clubs paying into some type of fund for the benefit of gaining an affiliation or moving up in classification.

26. Initially, the National Association's president, O'Conner, led the negotiations for a new PBA on behalf of MiLB.

27. During the negotiations, the National Association knew that losing an affiliation with a major league club would be financially devastating to any MiLB club.

28. On November 6, 2019, the BOT held a special meeting and voted to authorize the President to appoint members of the BOT, including Volpe, to a Negotiating Committee. The BOT formally passed a resolution to establish a Negotiating Committee to represent MiLB in its negotiations with MLB. By and through that resolution, O'Conner formally delegated his "plenary and exclusive power over relations with Major League Baseball" under the NAA to negotiate a new PBA, to a committee of minor league club owners. The BOT further voted in that resolution to indemnify members of the Negotiating Committee so long as their actions were "taken as Committee members in good faith for the benefit of the National Association as a whole as contemplated in NAA Section 4.02."

29. The BOT members of the Negotiating Committee acknowledged that by serving on the Negotiating Committee they were acting on behalf of all MiLB clubs as agents for the President. On November 18, 2019, the Negotiating Committee, including Volpe, sent a letter to MLB informing MLB that, going forward, the Negotiating Committee "will be representing

MiLB" in the PBA negotiations.  As such, the Negotiating Committee, as members of the committee and as members of the BOT, owed fiduciary duties to all other members of the National Association, including SEI, under statute, the terms of the NAA, and 100 years of history of operation of the National Association.

30. During late 2019 and most of 2020, the Negotiating Committee provided regular updates on the negotiations directly to all MiLB clubs, including SEI, further demonstrating that members of the Negotiating Committee knew and understood their role as fiduciaries for all MiLB clubs.  Similarly, in part based on these updates, as well as the actual authority of the National Association to represent MiLB clubs in negotiations with MLB, MiLB clubs, including the Volcanoes, reasonably believed the National Association, by and through the members of the Negotiating Committee, were acting as a fiduciary and furthering the interests of all MiLB clubs in the negotiations with MLB.

31. As a member of the National Association, SEI had placed its trust and confidence, as well as its financial interests with respect to its PDC and the relationship with MLB, in the hands of the National Association.  In fact, by the terms of the NAA, SEI was prohibited from negotiating directly with MLB.  Based on that and the numerous representations by the Negotiating Committee that it was, in fact, negotiating on behalf of all MiLB clubs, the Volcanoes did not pursue its own negotiations with MLB or take other steps to secure its future with MLB during 2020.

32. The Negotiating Committee withheld information regarding the negotiations with MLB from the National Association and its members, including information indicating that MLB proposed eliminating the National Association and replacing it with a system of franchises or license agreements entered directly between the major league club and the minor league club

affiliates. In fact, it was Volpe who first proposed the concept of a franchise system to replace the PBA.

33. Contrary to the representations by the Negotiating Committee, the Negotiating Committee was secretly negotiating the terms of the new franchise system that MLB wanted. On May 14, 2020, the Negotiating Committee submitted to MLB a list of 14 "Proposed Agreement Principles." As part of those principles, the Negotiating Committee proposed a limited minor league system of only 120 teams, with two new teams that had not previously been affiliated with MiLB, a minimum season length of 140 games for all minor league teams, and certain other restrictions for the "protection of franchise equity values" of the minor league teams. Another "principle" proposed by the Negotiating Committee stated:

> MLB to indemnify MiLB, its leagues, members and representatives against any liability related to a new agreement including but not limited to claims by owners of teams that currently have a PDC but MLB has determined will not get a Standard License under the new agreement and teams that MLB has determined will receive Standard License to play in a lower level league than that team is currently playing in.

34. In and around May 2020, O'Conner issued a written notice to all minor league clubs and their representatives, including all members of the Negotiating Committee, reminding them that pursuant to the terms of the NAA, they were prohibited from entering into "any negotiation to become a member of or in any way cooperate with any organization of professional baseball clubs whose existence will in any manner conflict with the letter and spirit of the [NAA], or the interest of any of the clubs operating under it . . . ." (emphasis added).

35. In and around June or July 2020, because of his concerns that members of the BOT and the Negotiating Committee were acting against the interests of the National Association, O'Conner disbanded the Negotiating Committee and took back control over the negotiation with MLB. In early August 2020, O'Conner submitted a proposal to MLB that included substantial benefits to teams that would lose affiliation or change classification.

36. On information and belief, in response to O'Conner's actions, the BOT, including Volpe, held an informal meeting on or about August 7, 2020, and voted to authorize one or more minor league club owners to contact MLB directly and inform MLB that the BOT would create a new committee of its members to continue negotiations, all without O'Conner's consent. On information and belief, a minor league club owner did in fact contact MLB and indicated that O'Conner would be replaced in the negotiations with MLB.

37. Following the informal vote by the BOT, the BOT established another Negotiating Committee with BOT members, including Volpe.

38. On or about August 27, 2020, MLB responded to the Negotiating Committee's Proposed Agreement Principles with its "MiLB Business Plan," adopting many of the "principles" proposed by the Negotiating Committee, including a plan to replace the PBA system with a new franchise-based system and reduce the number of minor league clubs from 160 to 120. Specifically, MLB proposed to: (a) reorganize MiLB into a fewer number of leagues with a total of 120 affiliated MiLB teams; (b) end its affiliation with 40 other MiLB teams; and (c) eliminate the National Association and the PBA and replace it with a franchise/license system involving Professional Development Licenses ("PDLs") between major league clubs and select minor league club affiliates.

39. Under MLB's proposal, each major league club would receive four PDLs that it could issue to four minor league clubs, thereby "entitl[ing] [the chosen club] to similar rights as existed under the [PBA]." Each PDL would last for 10 years. The MiLB Business Plan further stated that in the event a PDL "Holder" (i.e., a minor league club) does not receive an affiliation after the expiration of any 10-year term of the PDL, it would "receive[] [a] guaranteed buyout." Notably, MLB further committed as part of any new agreement to meet with MiLB clubs that do

not receive a PDL in order to "facilitate the form of baseball that is best for that community in 2021 and beyond."

40.     With no plan B in place, the National Association had no ability to push back against the highly unfavorable terms presented by MLB. Ultimately, the Negotiating Committee, the BOT and the National Association allowed the PBA to expire without a plan B and left the National Association members, whose teams were not among the 120 teams, without any MLB affiliation. By failing to come to any agreement with MLB, the National Association, BOT, and the Negotiating Committee further lost any benefits for MiLB clubs that would not receive a PDL, which MLB had continuously agreed to provide under any new agreement.

41.     Notwithstanding its knowledge of MLB's proposal, on September 30, 2020, the day the PBA expired, the Negotiating Committee issued the following press release that failed to mention the new franchise proposal:

> For more than a century, Major League Baseball (MLB) and Minor League Baseball (MiLB) have worked together to grow the game of baseball into America's Pastime. The current agreement between MLB and MiLB expires today. Minor League Baseball's negotiators have been meeting with MLB to reach a new agreement – one that would continue the relationship with MLB and preserve affordable, family-friendly entertainment in each of our 150 communities across the nation. Minor League Baseball will continue to work in good faith over the coming weeks to reach a well-designed and fair agreement that meets MLB's player development needs and continues the relationship between the two for generations to come.

42.     O'Conner warned of allowing the Negotiating Committee to spearhead negotiations with MLB because it was comprised of a "group with 'skin in the game,' precisely because those in ownership may have interests (or perceived interests) at odds with the interest of other owners."

43.     The members of the Negotiating Committee acted in their own self-interest and to the detriment of the other National Association members, including SEI.

44. Following the expiration of the PBA, MLB began entering into direct agreements with the minor league clubs. On or about December 9, 2020, MLB issued its list of 120 MiLB teams that would be eligible to receive contracts to affiliate with one of MLB's 30 member teams. SEI was not on that list.

45. Finally, in early 2021, after repeated inquiries, MLB finally advised that the Volcanoes had not been selected as an "operator" under one of the PDLs.

46. After decades working together towards the common mission of promoting professional minor league baseball, SEI was failed by the organization that had been entrusted to represent the interest of SEI and minor league baseball as a whole. SEI is now left with no league to play in, no coaches, no players, and an empty stadium with no games to play.

47. Members of the National Association gave over control of the relationship with MLB and its clubs to the National Association. Through its actions in 2019 and 2020, the BOT exercised that control and, as a result, assumed the responsibility to further the economic interests of SEI and all the member clubs.

48. On information and belief, the members of the Negotiating Committee breached their fiduciary duties to the other members of the National Association by secretly acquiescing to MLB's proposal, to the detriment of the 42 minor league clubs that would be excluded.

49. National Association's wrongful acts or omissions as part of the negotiation include, without limitation:

    a. granting authority to the Negotiating Committee and other club owners to negotiate directly with MLB without approval by O'Conner;

    b. failing to use care of an ordinary prudent person to avoid the dissolution of the National Association;

    c. failing to keep the membership informed;

    d.    failing to maintain unity of the membership in negotiations with MLB;

    e.    failing to take reasonable steps as part of the negotiations with MLB to protect all its clubs, such as hiring outside legal counsel;

    f.    failing to secure rights or benefits for disaffiliated MiLB clubs, including SEI; and

    g.    failing to use reasonable care to negotiate a new PBA for the benefit of the entire membership and failing to secure rights or benefits for disaffiliated MiLB clubs, including SEI.

50.    On information and belief, in 2019, MLB established an internal valuation metric and assigned values to the minor league clubs. Based on MLB's own internal valuations, Class A – Long Season (High-A) teams had an estimated value of $10 million.

51.    As a direct result of the failure to negotiate a new PBA on behalf of all members of MiLB and SEI's subsequent disassociation with MiLB, SEI suffered damages in an amount of $5,550,000, which represents the loss in value to SEI's ownership of the Volcanoes club (less other recoveries received).

### *The D&O Policy*

52.    RSUI issued a Non-Profit Organization Management Liability Policy to the National Association, Policy No. PP686029. A copy of the D&O Policy is attached as <u>Exhibit 1</u>.

53.    The policy was a renewal of a prior policy which had provided similar coverage from March 12, 1999, up to the current policy period, which ran from March 12, 2020, through March 12, 2021.

54.    The D&O Policy issued by the Insured included Directors and Officers Liability Insurance with an aggregate limit of liability of $3,000,000.

55.    The D&O Policy is governed by the laws of the state of incorporation for the insured organization, in this case the National Association, a Florida not-for-profit.

56. The D&O Policy defines "Insured Organization" as the National Association, and "Insured Person" as "any past, present or future director, officer, trustee, Employee, advisory board member or any committee member of a duly constituted committee of the Insured Organization."

57. The D&O Policy defines "Loss" as "damages, settlements, judgments (including pre- and post-judgment interest on a covered judgment) and Defense Expense." "Defense Expense" is defined as "reasonable and necessary legal fees and expenses incurred, with the insurer's consent, by any insured in defense of a Claim."

58. The D&O Policy provides that if a "Claim" is made for a "Wrongful Act," the Insurer will pay for (i) all "Loss" for which the "Insured Organization is required or permitted to indemnify the Insured Person" and (ii) all "Loss" the Insured Organization is legally obligated to pay." "Wrongful Act" is defined as "any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty *** by:  1. an Insured Person ***; or 2. The Insured Organization."

*Volpe Assignment and Judgment Against National Association*

59. On February 22, 2021, following the failure of the National Association and the Negotiating Committee to obtain a new PBA and the subsequent loss of its affiliation with an MLB team, plaintiff filed a complaint against the National Association and Tom Volpe, and other defendants in Marion County Circuit Court in Oregon, Case No. 21CV06637 (the "Action").  The complaint alleged, among other claims, the National Association and Volpe breached their fiduciary duties to plaintiff.  A copy of the complaint is attached as <u>Exhibit 2</u> and incorporated herein by reference.

60. The National Association filed a motion to compel arbitration for the claims asserted in the Action, which was granted.  The order granting the motion to compel also

included SEI's claims against Volpe. Accordingly, the trial court stayed the complaint against both the National Association and Volpe pending resolution of the arbitration.

61. On February 24, 2022, plaintiff filed a demand for arbitration and served it on the National Association and Volpe. A copy of the arbitration demand and statement of claim is attached as Exhibit 3 and incorporated herein by reference. On information and belief, the National Association tendered the demand for arbitration to defendant for defense and indemnity under the D&O Policy. On information and belief defendant denied both coverage and defense of the claim.

62. On June 20, 2022, plaintiff filed a first amended statement of claim in the arbitration. A copy of the first amended statement of claim is attached as Exhibit 4 and incorporated herein by reference.

63. On information and belief, the National Association tendered one or more of (i) the complaint, (ii) the arbitration demand and statement of claim, or (iii) the first amended statement of claim (collectively the "National Association's Notices of Claims") to defendant for defense and indemnity under the D&O Policy. On information and belief, defendant denied both coverage and defense of the claims stated in the National Association's Notices of Claims.

64. On or about February 2, 2023, the National Association formally dissolved as a Florida nonprofit corporation. Thereafter the National Association ceased participating in the arbitration. On July 10, 2023, plaintiff filed a second amended statement of claim. A copy of the second amended statement of claim is attached as Exhibit 5 and incorporated herein by reference.

65. On information and belief, Volpe tendered one or more of (i) the complaint, (ii) the arbitration demand and statement of claim, (iii) the first amended statement of claim, or (iv) the second amended statement of claim (collectively the "Volpe's Notices of Claims") to

defendant for defense and indemnity under the D&O Policy.  On information and belief, defendant denied both coverage and defense of the claims stated in Volpe's Notices of Claims.

66. On or about August 17, 2023, Volpe assigned all his rights as an insured under the D&O Policy to plaintiff.  A copy of the assignment is attached hereto as <u>Exhibit 6</u> and incorporated herein by reference.

67. On September 21, 2023, the Marion County Circuit Court entered an order setting aside its prior order compelling arbitration as to the claims against the National Association.

68. On January 10, 2024, a General Judgment by Default and Money Award against the National Association was entered in Marion County Circuit Court in the amount of $5,550,000.  A copy of the judgment is attached as <u>Exhibit 7</u> and incorporated herein by reference.

## COUNT I
## BREACH OF CONTRACT
(as Judgment Creditor for National Association)

69. SEI realleges paragraphs 1 through 68 and incorporates them herein.

70. At all material times, the National Association was an insured under the D&O Policy, which is a binding, valid, and enforceable insurance contract.

71. Under the D&O Policy, RSUI promised to pay the loss of any insured person arising from a "Claim" made against such insured person for any "Wrongful Act."

72. In the Underlying Action, SEI alleged a "Claim" that it suffered damages as a direct result of the National Association's "Wrongful Acts," as more fully described in paragraph 46 above.

73. RSUI, through the acts of its agents, representatives, and/or employees, failed to perform its duties and/or obligations under the D&O Policy and thus breached the contract by its

acts or omissions as alleged herein, including without limitation, its failure and refusal to: (i) acknowledge defense or indemnity coverage with respect to the claims asserted against the Insureds in the Underlying Action, and (ii) consent to a reasonable settlement of the claims against the Insureds and tender policy limits.

74. SEI obtained a judgment against the National Association based on the allegations and claims asserted in the Underlying Action.

75. SEI is a judgment creditor of the National Association and holds a judgment in the amount of $5,550,000 plus interest at 9% per annum.

76. Under New Hampshire and Florida law, as a judgment creditor of the National Association, SEI is a third-party beneficiary of the D&O Policy and has the right to payment of all amounts payable by RSUI on behalf of the National Association under the D&O Policy.

77. RSUI breached the D&O Policy by failing to pay the "Loss" (i.e., the judgment) arising from the "Claim" based on a "Wrongful Act" committed by the National Association.

78. As a direct, proximate, and natural result of the breach of RSUI, the National Association, and SEI as its judgment creditor, have been deprived of the benefits due under the D&O Policy and have suffered foreseeable damages.

79. SEI is entitled to damages from defendant up to the lesser of (i) $5,550,000 or (ii) the full amount of the limits of coverage under the D&O Policy.

## COUNT II
## BREACH OF CONTRACT
(as Assignee of Volpe)

80. SEI realleges paragraphs 1 through 79 and incorporates them herein.

81. During the policy period, Volpe was a member of the BOT of the National Association and was a member of the Negotiating Committee as described more fully above and

the statement of claim, the first amended statement of claim, and the second amended statement of claim and is an "Insured Person" under the D&O policy.

82. In the Underlying Action, SEI alleged a "Claim" that it suffered damages as a direct result of Volpe's "Wrongful Acts," as more fully described in paragraph 46 above.

83. Under the D&O Policy, RSUI was obligated to pay Volpe for his loss arising from the claims in the Underlying Action, as Volpe was a member of the BOT and the Negotiating Committee.

84. Volpe has assigned all his rights as an Insured Person under the D&O Policy to SEI.

85. SEI is entitled to recover from Insurer any amounts paid by Volpe to defend or settle the "Claims" alleged by SEI in the Action, in an amount to be proven at trial but estimated to be not less than $266,000.

## COUNT III
## CIVIL REMEDY UNDER FLA. STAT. §624.155

86. SEI realleges paragraphs 1 through 79 and incorporates them herein.

87. RSUI violated §624.155(1)(b)(1) by not attempting in good faith to settle claims on behalf of its insureds, the National Association and Volpe. RSUI failed to properly and promptly defend the claims asserted against the Insureds by SEI. RSUI made *no* effort to settle the claims asserted against the National Association. And Volpe ultimately settled with SEI on his own to avoid greater liability to SEI and additional defense costs.

88. RSUI violated §624.155(1)(b)(1) by denying the claim without conducting a reasonable investigation. In fact, RSUI never appointed defense counsel on behalf of the National Association or Volpe to evaluate the claims asserted by SEI or engage in the discovery process to ascertain the Insured's potential liability.

89. On November 29, 2024, SEI submitted a Civil Remedy Notice of Insurer pursuant to Section 624.155 of the Florida Statutes (the "CRN"). The CRN complied with all provisions of Fla. Stat. §624.155(3)(b).

90. On December 2, 2024, SEI mailed a copy of the CRN to RSUI.

91. RSUI received a copy of the CRN no later than December 11, 2024.

92. RSUI failed to tender the lesser of the policy limits or the amount demanded by SEI within 90 days after receipt of the CRN.

93. SEI is entitled to its actual damages of $5,550,000.

94. Pursuant to Fla. Stat. §624.155(7), SEI is entitled to recover its reasonable attorney fees.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for a judgment as follows:

1. On Count I, judgment against defendant for $5,500,000 or policy limits, whichever is less;

2. On Count II, judgment against defendant for an amount to be proven at trial, but not less than $266,000;

3. On Count II, judgment against defendant for an amount to be proven at trial, but not less than $266,000;

4. An award of pre- and post-judgment interest at the legal rate;

5. An award of SEI's costs and disbursements incurred in this action;

6. An award of SEI's reasonable attorney fees and costs; and

7. For any other relief the court deems just and appropriate.

### Demand for Jury Trial

    Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

DATED: June 3, 2025

                        Respectfully Submitted,

                        LAW OFFICE OF R. TERRY PARKER LLC

                        */s/ R. Terry Parker*
                        R. Terry Parker, Esq. (NH Bar No. 268605)
                        P.O. Box 1973
                        Concord, NH 03301
                        Telephone: (603) 496-8473
                        Email: terry@rterryparkerlaw.com

                        TARLOW NAITO & SUMMERS LLP

                        */s/ Alexander M. Naito*
                        Alexander M. Naito
                        2014 NE Broadway
                        Portland Oregon 97232
                        Telephone: (503) 968-9000
                        Email: alex.naito@tnslaw.net

                        Pro Hac Vice Application forthcoming

                        Steven L. Naito
                        2014 NE Broadway
                        Portland Oregon 97232
                        Telephone: (503) 968-9000
                        Email: steve.naito@tnslaw.net

                        Pro Hac Vice Application forthcoming

                        *Attorneys for Plaintiff*
                        *Sports Enterprises, Inc.*